IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.

HENRY FORD,

                Defendant.

CRIMINAL ACTION
NO. 23-130

## OPINION

**Slomsky, J.**                                                          **December 3, 2024**

## I.    INTRODUCTION AND BACKGROUND

Presently before the Court is Defendant Henry Ford's ("Defendant") Motion to Revoke Pretrial Detention. (Doc. No. 34.) On March 23, 2023, the Government filed a sealed Indictment against Defendant, charging him with one count of securities fraud under 15 U.S.C. §§ 78j(b), 78ff, and 17 C.F.R. §§ 240.10b-5 and aiding and abetting under 18 U.S.C. § 2 (Count I), and seven counts of wire fraud under 18 U.S.C. § 1343 (Counts II through VIII).[1] (Doc. No. 1.) On August 1, 2024, United States Magistrate Judge Elizabeth T. Hey granted the Government's Motion for Pretrial Detention and issued a Pretrial Detention Order. (Doc. No. 14.) Judge Hey ordered that Defendant be detained, finding that (1) Defendant has a substantial incentive to flee, (2) Defendant has a significant criminal history, (3) Defendant lacks community ties and employment, and (4) there is a high risk that Defendant will not appear as required by the Court.[2] (Id.)

On October 24, 2024, Defendant filed the instant Motion to Revoke Pretrial Detention. (Doc. No. 34.) On October 31, 2024, the Government filed its Response in Opposition. (Doc. No.

---

[1]  The Indictment has since been unsealed. (See Doc. No. 4.)

[2]  Judge Hey did not find, and the Government does not contend, that Defendant is a danger to the community. (Doc. No. 34 at 5; see generally Doc. No. 36.)

36.)  Thereafter, Defendant sent to the Court a pro se response in Opposition to the Government's Detention Objection, which was filed of record.  (Doc. No. 42.)  On November 20, 2024, the Court held a hearing on the Motion at which Defendant was present, as were his counsel and Government counsel.  On November 27, 2024, both parties filed Supplemental Memoranda in support of their respective positions on Defendant's Motion.  (Doc. Nos. 43, 44.)

In the Motion, Defendant argues he should be released pending trial because there is a combination of conditions that will give reasonable assurance of his appearance in court as directed.  (Doc. No. 34 at 4-5.)  Defendant is age 50 and, as detailed in the Motion, Defendant has a bachelor's degree from Grand Canyon University and a Master's degree in programming from Phoenix University.  (Id. at 2.)  Should the Court grant pre-trial release, Defendant's mother, Diane Wilson, and one of his adult sons, Cleo Jackson, have each agreed to provide Defendant a place to live and serve as his sponsor.  (Id.)  His mother resides with her husband, Marshall Wilson, a recently retired deputy sheriff, in a four-bedroom house in Greenville, Mississippi.  (Doc. No. 43 at 2.)  She currently works as a teacher and was formerly a school principal.  (Id.)  Defendant's son, Cleo Jackson, resides in Arizona in a two-bedroom apartment.  (Doc. No. 34 at 2.)  Defendant's three other adult children also reside in Arizona.  (Id.)  Mr. Jackson is twenty-seven (27) years old and currently works for Wells Fargo Bank.  (Doc. No. 43 at 2.)  As such, Defendant posits that both his mother and his son have offered suitable residences for Defendant to reside on pre-trial release.  (See id.)

While Defendant acknowledges that Judge Hey's decision to detain him pending trial was predicated upon the belief that Defendant poses a risk of flight, he argues that his conduct in the one prior criminal case in which he was convicted proves otherwise.  (Id. at 5.)  In 2010, Defendant was indicted in Arizona and charged "with conspiracy to commit wire fraud, wire fraud, and money

laundering in connection with allegations of mortgage fraud." (Id.)  While on pre-trial release, the Arizona court permitted Defendant to live with his mother in Mississippi during which he was "fully compliant with the conditions of his release." (Id. at 5-6.)  Because this demonstrates Defendant is capable of complying with pre-trial release conditions, he argues that he should again be released to live with his mother in Mississippi or, alternatively, with his adult son, Cleo Jackson, in Arizona. (Id. at 6.)  He contends the third-party supervision of Defendant by either his mother or his son, combined with other conditions of release the Court can impose such as home detention with GPS monitoring and the surrender of Defendant's passport, will "reasonably assure [his] appearance in court and the safety of the community." (Id. at 7.)

The Government counters that Defendant's Motion should be denied primarily because Defendant poses a significant risk of flight.  As described by the Government, the charges against Defendant in the instant case stem from Defendant allegedly defrauding investors in his company, Fallcatcher, out of $5 million. (Doc. No. 36 at 1.)  Defendant reportedly first learned of an investigation into Fallcatcher's activities in late 2018 when the United States Securities and Exchange Commission ("SEC") served a subpoena on Fallcatcher seeking company records. (Id. at 3.)  The Government alleges that, in response to this subpoena, Defendant allegedly took "various actions . . . to conceal his fraud upon the investors in Fallcatcher," including lying in multiple SEC depositions, producing "to the SEC a fraudulent email chain," and transferring approximately $233,000 from Fallcatcher's bank accounts to himself. (Id.)  When Defendant learned the SEC's investigation had developed into a criminal investigation, he left the United States for five years, boarding a flight to Morocco on June 23, 2019 and failing to board his return flight from Qatar on July 19, 2019. (Id. at 5.)

During the five years Defendant remained outside the United States, he repeatedly checked on the status of the criminal case against him.  (Id.)  For example, in April 2020, Defendant emailed the Federal Bureau of Investigations ("FBI") agent assigned to his case regarding the status of the criminal investigation, attempting to justify his actions.  (Id.)  Then, in April 2024, Defendant submitted a Freedom of Information Act ("FOIA") request to the United States Marshals Service ("USMS") asking "whether there were any federal or state warrants for him, and whether [the] Department of Homeland Security had in place any requests for custody holds relating to him." (Id. at 5-6.)  On May 15, 2024, the USMS responded to Defendant's FOIA request, reporting that no responsive records had been located.  (Id. at 6.)  Less than two months later, on July 8, 2024, Defendant was arrested on a sealed warrant after he attempted to enter the United States by bus in Nogales, Arizona.  (Id.)  As the Government points out, Defendant's date of re-entry into the United States came just "two months more than five years after [Defendant] caused Fallcatcher funds to be transferred to himself . . . and just two weeks more than five years after he took a flight from Miami to Morocco . . . It appears more than coincidental that the statute for limitations for wire fraud is five years."  (Id.)

After consideration of the arguments made by counsel for the parties at the hearing, the briefs filed of record, and for the reasons explained below, the Court will deny Defendant's Motion to Revoke Pretrial Detention (Doc. No. 34).

## II.    JURISDICTION

Defendant's Motion to Revoke Pretrial Detention is a request for a review of Magistrate Judge Hey's August 1, 2024 Detention Order.  This Court has jurisdiction to review a Magistrate Judge's Detention Order under 18 U.S.C. § 3145(b).  Section 3145(b) "requires this Court to make a de novo determination of findings of fact underlying the detention Order."  United States v. Cole,

715 F. Supp. 677, 677 (E.D. Pa. 1998) (citing <u>United States v. Delker</u>, 757 F.2d 1390, 1394 (3d Cir. 1985)).

## III.    LEGAL STANDARD

Motions for bail or pretrial release pending trial are governed by the Bail Reform Act of 1984, 18 U.S.C. § 3141 <u>et</u> <u>seq.</u>  Section 3142(e)(1) provides that a judicial officer must order the pretrial detention of a federal defendant "[i]f, after a hearing . . . , the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community . . . ."  18 U.S.C. § 3141(e)(1).  In seeking pretrial detention based on a defendant's risk of flight, the Government must persuade the court by a preponderance of the evidence that no conditions will reasonably ensure the defendant's appearance.  <u>United States v. Himler</u>, 797 F.2d 156, 160-61 (3d Cir. 1986).  Where the Government seeks pretrial detention based on safety, however, its burden is to persuade the court by clear and convincing evidence that the defendant poses a danger to the community.  <u>Id.</u>; 18 U.S.C. § 3142(f).

In making the determination as to whether a defendant will appear as required prior to trial, a court is instructed by the Bail Reform Act to consider the following factors:

(1) the nature and circumstances of the offense charged . . . ;

(2) the weight of the evidence against the person;

(3)  the history and characteristics of the person, including –

    (A)   the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

    (B)   whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. . . .

18 U.S.C. § 3142(g).[3]

## IV.    ANALYSIS

### A.    Nature and Circumstances of the Offense Charged

Regarding § 3142(g)'s first factor, Defendant is charged with the following:  (1) one count of securities fraud under 15 U.S.C. §§ 78j(b), 78ff, and 17 C.F.R. §§ 240.10b-5, and aiding and abetting under 18 U.S.C. § 2; and (2) seven counts of wire fraud under 18 U.S.C. § 1343.  (See Doc. No. 1.)  These charges stem from Defendant allegedly defrauding the Fallcatcher investors out of $5 million.  (See id.)  If convicted of these charges, the potential guidelines range for Defendant's sentence is 78 to 87 months' imprisonment.  (Doc. No. 34 at 2; Doc. No. 36 at 6.)  The first factor alone would not require pre-trial detention.

### B.    Weight of the Evidence Against Defendant

Next, concerning § 3142(g)'s second factor, the weight of the evidence proffered by the Government to support the charges against Defendant appears to be substantial.  The Government's evidence includes the following:

a.    From in or about February 2018 through in or about Spring 2019, defendant Henry Ford defrauded investors out of approximately $5,000,000. He used his business called Fallcatcher, the stated goal of which was to develop and market an electronic system designed to track use of medication by addiction recovery patients to prevent relapse. In or about Spring 2018, after Ford ran out of investor funds purportedly developing this "system," Ford used an acquaintance in the Eastern District of Pennsylvania who had access to a network of investors to raise funds from these investors. As a result, in June 2018, Ford made presentations in person to potential investors who were part of this acquaintance's network, at locations in Pennsylvania and New Jersey. During these presentations, Ford made false and misleading statements regarding the proposed investment and showed investors a fraudulent letter of interest from a major insurance company ("Company 1"). In

---

[3]    As mentioned above, the parties agree that Defendant is not a danger to the community as assessed under § 3142(g)'s fourth factor.  (Doc. No. 34 at 5; see generally Doc. No. 36.)

addition, Ford caused his acquaintance to distribute further false and misleading statements over the next several months.

b. As a result of these deceptive fundraising efforts, Ford caused approximately 50 investors to invest approximately $5 million in total in Fallcatcher in August and September 2018. Moreover, during this period, Ford continued to make false and misleading statements regarding Fallcatcher to investors and potential investors.

c. During an investigation by the U.S. Securities and Exchange Commission (the "SEC") in late 2018, the SEC served a subpoena upon Fallcatcher seeking records, including records regarding Company 1, other insurance companies, and Fallcatcher's investors. In response to this investigation, Ford took various actions in late 2018 and the first half of 2019 to conceal his fraud upon the investors in Fallcatcher. For instance, Ford lied in multiple SEC depositions. In addition, Ford, through his counsel, produced to the SEC a fraudulent email chain to hide his fraud.

d. Also during the SEC investigation, after agreeing in April 2019 that Fallcatcher would provide the SEC with three days' notice before any transfers out of Fallcatcher's bank accounts, Ford caused Fallcatcher to transfer approximately $223,000 to himself in early May 2019, without providing the agreed-upon notice to the SEC. These funds were among the $5 million that Ford had raised from investors through fraud.

(See Doc. No. 36 at 2-4.)  The second factor too, even when combined with the first factor, would not require pre-trial detention.

## C.    Defendant's History and Characteristics

Finally, regarding § 3142(g)'s third factor, Defendant's history and characteristics, unfortunately for him, require his continued pretrial detention for three reasons:  (1) his lack of ties to the community and lack of employment in the United States, (2) his criminal history, and (3) his significant risk of flight.[4]  First, Defendant has no ties to the Eastern District of Pennsylvania community nor employment within the United States.  Defendant's mother resides in Mississippi and his four adult children each reside in Arizona.  (Doc. No. 34 at 2.)  Defendant has not resided in the United States for five years and he has never lived in the Philadelphia area.

---

[4]   There is no information relating to Defendant's physical and mental condition nor any history of drug or alcohol abuse.  See 18 U.S.C. § 3142(g)(3)(A).

(Doc. No. 36 at 7.)  Moreover, Defendant has not been employed in the United States for five years.  (Id.)  Defendant reported to Pretrial Services that he most recently lived and worked in the United Arab Emirates, Thailand, Malaysia, Indonesia, Tunisia, Guinea, and Mexico.  (Id. at 8.) Accordingly, rather than having ties to Philadelphia or even the United States, Defendant instead has significant ties outside of the United States.

Next, as briefly mentioned above, Defendant has a criminal history.  In 2011, Defendant was sentenced to 30 months' imprisonment and five years' supervised released in a federal case involving conspiracy to commit wire fraud.  (Id. at 7.)  That case, in which Defendant was the lead defendant, involved allegations of mortgage fraud.  (Id.)

Third, Defendant has demonstrated that he poses a significant risk of flight.  Shortly after Defendant learned of the criminal investigation in this case, he fled the United States for five years and did not return until the USMS responded to his FOIA request, reporting that there were no outstanding state or federal warrants, nor any requests for custody, relating to Defendant.  (Id. at 5-6.)  The Indictment in this case, however, had been filed on March 23, 2023 and placed under seal so it did not come up when Defendant filed the FOIA request.  (See Doc. No. 1.)

Defendant's actions demonstrate that he was aware of the federal criminal investigation into his activities with Fallcatcher.  For example, in the days leading up to Defendant fleeing, Defendant's counsel on the SEC's case repeatedly referenced the criminal investigation against Defendant and Fallcatcher in documents and conversations relating to the SEC proceeding.  (Id. at 4-5.)  Moreover, in June 2020, while absent from the United States, Defendant contacted the FBI agent in charge of investigating the criminal case in an attempt to justify his actions with Fallcatcher.  (Id. at 5.)  And in April 2024, Defendant submitted a FOIA request to the USMS asking whether there were any outstanding state or federal warrants relating to him.  (Id. at 5-6.)

Notably, Defendant did not return to the United States until he apparently believed the five-year statute of limitations for wire fraud had passed.  As outlined by the Government, Defendant's last known criminal acts in the instant case occurred in May 2019.  (Id. at 10.)  Defendant then fled the United States in June 2019.  (Id.)  Defendant had previously been charged with wire fraud relating to allegations of mortgage fraud.  (Id.)  Defendant did not return to the United States until July 8, 2024, more than five years after his last known actions relating to this case.  (Id.)

And when Defendant finally decided to return to the United States, he reportedly attempted to sneak into the country undetected.  (See id. at 5.)  As detailed by the Government in their Opposition Brief (Doc. No. 36) and at the November 20, 2024 hearing, shortly after the USMS responded to Defendant's FOIA request in May 2024 reporting that no warrants or requests for Defendant's arrest were found, Defendant traveled to Mexico.  (Id. at 6.)  Defendant told Pretrial Services that he stayed in Mexico for a month and a week before entering the United States on July 8, 2024.  (Id.)  But, rather than taking a flight back into the country, Defendant chose to enter the United States by bus through Nogales, Arizona, a small town on the Mexico-Arizona border. (See id.)  Upon crossing the border into the United States, the Nogales police arrested Defendant on the sealed warrant issued in the present case.

Moreover, the five years Defendant spent living outside the United States demonstrate that he is capable of supporting himself overseas.  As Defendant reported to Pretrial Services, he successfully obtained employment in the United Arab Emirates, Thailand, Malaysia, Indonesia, Tunisia, Guinea, and Mexico.  (Id. at 8.)  And his five-year flight also demonstrates that, despite his mother and children residing in the United States, this is not enough to keep Defendant in the country.  In fact, in June 2019 when Defendant fled, he was living in Miami with his then-wife and

their young child. (Doc. No. 44 at 1.) But despite having a wife and young child at home, Defendant still fled to Morocco and did not return for five years. (<u>Id.</u>)

While Defendant's previous compliance with pre-trial conditions has been considered by the Court, this compliance does not mitigate the risk of flight Defendant has already proven himself to be in the instant case. As such, Defendant's nature and characteristics, including his significant risk of flight, overcome any other factor to be considered under § 3142(g). Accordingly, the Government has met its burden of proving by a preponderance of the evidence that Defendant poses a significant risk of flight and no condition or combination of conditions other than pretrial detention of Defendant will reasonably assure his continued appearance in court. For that reason, pretrial detention of Defendant is warranted.

## V.    CONCLUSION

For the foregoing reasons, Defendant's Motion to Revoke Pretrial Detention (Doc. No. 34) will be denied. An appropriate Order follows.