IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NUMBER 23-130 |
| | : | |
| HENRY FORD | : | |

**SENTENCING MEMORANDUM OF DEFENDANT HENRY FORD**

**I.   INTRODUCTION**

Approximately ten years ago, the country was in the grip of a prescription opioid addiction crisis caused, in part, by the pharmaceutical industry's aggressive marketing of painkilling medication that was loosely regulated.[1] In response to this

---

[1] In a New Yorker article that pre-dated publication of his book *Empire of Pain*, Patrick Raddon Keefe summarized the manner in which the avaricious profiteering of pharmaceutical companies led to mass addiction by the consumers of its drugs.

> Purdue Pharma— developed the prescription painkiller OxyContin. Upon its release, in 1995, OxyContin was hailed as a medical breakthrough, a long-lasting narcotic that could help patients suffering from moderate to severe pain. The drug became a blockbuster, and has reportedly generated some thirty-five billion dollars in revenue for Purdue.

But OxyContin is a controversial drug. Its sole active ingredient is oxycodone, a chemical cousin of heroin which is up to twice as powerful as morphine. In the past, doctors had been reluctant to prescribe strong opioids—as synthetic drugs derived from opium are known—except for acute cancer pain and end-of-life palliative care, because of a long-standing, and well-founded, fear about the addictive properties of these drugs. "Few drugs are as dangerous as the opioids," [said] David Kessler, the former commissioner of the Food and Drug Administration.

Since 1999, two hundred thousand Americans have died from overdoses related to OxyContin and other prescription opioids. Many addicts, finding prescription painkillers too expensive or too difficult to obtain, have turned to heroin. According to the American Society of Addiction Medicine, four out of five people who try heroin today started with prescription painkillers. The most recent figures from the Centers for Disease Control and Prevention suggest that a hundred and forty-five Americans now die every day from opioid overdoses.

The crisis was initially precipitated by a shift in the culture of prescribing—a shift carefully engineered by Purdue. "If

1

epidemic, an addiction rehabilitation recovery industry grew up which was particularly prominent in Florida. In 2016, Defendant Henry Ford began to work in various capacities in rehabilitation clinics there; work that took him from driving a bus to being a behavioral health technician to working in toxicology sales and ultimately operating two halfway houses. From this experience, Mr. Ford witnessed not only the heartbreak of addiction, but also the vast abuse in the rehabilitation industry by both the providers and the patients. There was false billing, unnecessary treatment, and misuse of the system by patients to obtain excessive prescriptions.

---

you look at the prescribing trends for all the different opioids, it's in 1996 that prescribing really takes off," Kolodny said. "It's not a coincidence. That was the year Purdue launched a multifaceted campaign that misinformed the medical community about the risks." When I asked Kolodny how much of the blame Purdue bears for the current public-health crisis, he responded, "The lion's share."

OxyContin was launched with one of the biggest pharmaceutical marketing campaigns in history ….A major thrust of the sales campaign was that OxyContin should be prescribed not merely for the kind of severe short-term pain associated with surgery or cancer but also for less acute, longer-lasting pain: arthritis, back pain, sports injuries, fibromyalgia. The number of conditions that OxyContin could treat seemed almost unlimited. According to internal documents, Purdue officials discovered that many doctors wrongly assumed that oxycodone was *less* potent than morphine—a misconception that the company exploited….Within five years of its introduction, OxyContin was generating a billion dollars a year.

A recent paper by a team of economists, citing a dramatic uptick in heroin overdoses since 2010, is titled "How the Reformulation of OxyContin Ignited the Heroin Epidemic." A survey of two hundred and forty-four people who entered treatment for OxyContin abuse after the reformulation found that a third had switched to other drugs. Seventy per cent of that group had turned to heroin.

As Sam Quinones details in his 2015 book, "*Dreamland: The True Tale of America's Opiate Epidemic,*" heroin dealers from Mexico fanned out across the U.S. to supply a burgeoning market of people who had been primed by pill addiction. This is one dreadful paradox of the history of OxyContin: the original formulation created a generation addicted to pills; the reformulation, by forcing younger users off the drug, helped create a generation addicted to heroin. A recent paper by a team of economists, citing a dramatic uptick in heroin overdoses since 2010, is titled "*How the Reformulation of OxyContin Ignited the Heroin Epidemic.*" A survey of two hundred and forty-four people who entered treatment for OxyContin abuse after the reformulation found that a third had switched to other drugs. Seventy per cent of that group had turned to heroin.

https://www.newyorker.com/magazine/2017/10/30/the-family-that-built-an-empire-of-pain

Mr. Ford, who had both a military and civilian background in telecommunications and computer software, quickly discerned this problem and began to formulate a simple but effective strategy to address it, utilizing existing technology that married biometric devices with computing technology.

By requiring patients to register their daily admission and treatment at a treatment center through biometric identifying technology and requiring administrators to concurrently register their treatment, providers and insurance companies could track the patient's care and whereabouts eliminating duplication of care and overtreatment and thereby reducing fraud and abuse that accompanied the surge in treatment. Animated by this worthy goal and an entrepreneurial spirit, Mr. Ford founded a company he called Fallcatcher to develop and market the new technology. Mr. Ford tried several iterations of the company as he sought to build and develop the equipment and software and interest qualified professionals to join the fledgling business. Along the way, he found no lack of enthusiasm in the concept but struggled to obtain financing.

The project proceeded in fits and starts due to Mr. Ford's limited resources and difficulty obtaining financing. That changed in 2018 when Mr. Ford presented the Fallcatcher business concept to DV, an investment advisor and producer. DV was thrilled by the business concept and pitched it to his roster of investor clients, most of whom were likewise intrigued and excited by the potential upside of the

business. DV had Mr. Ford provide to him information which he passed on to his investors and had him make live presentations about the Fallcatcher concept and his vision for the company.

Mr. Ford realized that his dream was on the cusp of becoming a reality and went too far in his sales pitch. In his enthusiasm and urgency to obtain financing for Fallcatcher to take the big leap forward, to obtain the needed funding to complete the product's development and to market it appropriately, Mr. Ford regrettably made misrepresentations about insurance companies' advanced interest in the project stating there were insurers ready to proceed with pilots of the technology when that was not, in fact, true. DV amplified those statements in emails he sent of his own volition to his investor clients who ultimately invested approximately $4,964,775.79.

Mr. Ford's misrepresentations, however, were not designed to simply enrich himself at the expense of investors. They were made in the interest of capitalizing a legitimate and potentially lucrative business enterprise with a vetted business plan, bona fide executives and a board of directors that included investors. Mr. Ford did not steal investors' money. Indeed, there have been no allegations in the SEC civil enforcement action, the indictment here or in the PSR that Mr. Ford or anyone else in Fallcatcher committed theft or embezzlement of investor funds. The investment funds were spent pursuant to the plan set forth in the private placement memo. In

the final sum, $2.8 million of the $4,964,775.79 funds invested were recovered and returned to investors, a fact that is itself mitigating.

Mr. Ford has accepted responsibility for his actions in both the civil SEC action and in this criminal case obviating the need for complicated and expensive trials. In determining a sentence that is sufficient but not greater than necessary to achieve the goals of sentencing, the Court should substantially weigh this distinction in its calculation. For this reason and others set forth below in this sentencing memorandum, as well as at Mr. Ford's sentencing hearing, the Court should impose a mitigated sentence.

## II.  HENRY FORD'S BACKGROUND

Henry Ford was raised in Greenville, Mississippi. His father died in a car crash when Mr. Ford was seven years old and his mother remarried. His mother served in the Air Force and later became a schoolteacher and a school principal. Mr. Ford's step father was a sheriff. His fraternal half-sisters are a pharmacy technician and a social worker.

At the age of 19, Mr. Ford joined the Army National Guard and shortly thereafter assumed full-time active duty. During his time in the army, he worked in the Communications Command and developed skills and expertise in telecommunications technology and computing. Following his honorable discharge from the service, Mr. Ford held several positions with telecommunications

companies developing unique skill certifications.  Mr. Ford obtained a Bachelor's degree in Information Technology and a Master's degree in Business Administration from the University of Phoenix.  He has completed all of his coursework toward a Ph.D.  He has obtained certifications from various computer training programs and is a Cisco certified network professional and has expertise in ethical hacking from Cisco as well.  He also has a systems management certification from Microsoft.

Mr. Ford has been married twice and has four children, ages 22 to 33 with whom he remains close.  His children are employed as a police officer, pharmacy technician, bank representative, and a customer service representative for an automobile company.  Letters of support from his current partner and his second wife are attached at Exhibit "A."

### III.  THE FORMATION AND OPERATION OF FALLCATCHER

As noted above, Mr. Ford founded Fallcatcher with the idea that he could create technology that would vastly reduce the abuse and overbilling he observed, firsthand, in the addiction rehabilitation industry.  With the acquaintance of DV, Mr. Ford at last saw the chance of his business dream becoming a reality.  Aside from the misrepresentations he made to promote investment in Fallcatcher, the company was formed and, by all accounts, operated in a professional and wholly legitimate manner.

That process began with the recruitment of experienced and highly motivated business professionals and a board of directors. R. Scott Bennett, Fallcatcher's eventual Chief Executive Officer, was introduced to Mr. Ford by DV. Bennett was a graduate of the Business School of Indiana University and was an experienced senior business development and an operation executive with specific knowledge in the healthcare technology sector having been employed with Fortune 500 companies, including Xerox and Siemons, as well as private mid-size firms. Exhibit B at 19-20. He had over 20 years of experience leading Go-To-Market's team selling complex software and service solutions to hospitals, healthcare providers and government healthcare organizations, and was managing director of a privately held educational service firm at the time.

The second key management executive was Edward J. Lynch who served as the chief financial officer. Exhibit B at 20. He was a *magna cum laude* graduate in economics and business law from Florida Atlantic University, was the chairman of the board of Palm Beach County, CILB, and former chairman of the board of the Children's Healing Institute. He had served as a CFO of a computer electronic manufacturing firm. Lynch opened an 8A certified minority-owned business completing projects at Veterans Affairs medical centers and was an eventual candidate for the United States Congress. When he joined Fallcatcher, he was the

managing member of an architectural, construction, and real estate firm in South Florida.

There were also several highly experienced and capable business professionals on the board of directors, including Satish Kholay who was the founder of a biometric identity management company, who had experience managing technology startup ventures, with a background in engineering and marketing. Exhibit B at 19. Mark Scherer, who had an engineering background and helped build a construction company with 120 employees. Exhibit B at 19. The company also had an advisory board that included a former lieutenant governor from the state of Florida and an intellectual property attorney. Exhibit B at 19.

In the course of preparing for the stock offering, Mr. Ford, aside from engaging the services of DV, retained a highly experienced and capable securities attorney from the firm of Eckert Seamans who helped walk him through the private placement offering process. That process concluded with the preparation of a private placement memorandum ("PPM") which is a document that provides potential investors with detailed information about a private securities offering, such as the business, risks, and terms of the investment. The Fallcatcher private placement memorandum is attached hereto as Exhibit "B." Its purpose is to provide enough disclosure to comply with securities laws to protect the issuer from claims of misrepresentation or omission. Key components include a summary of the offering,

risk factors, business description, management team details, and financial information.

In Fallcatcher's case, Mr. Ford and Fallcatcher engaged a company with expertise in the preparation of PPMs to assist with its memorandum. The Fallcatcher PPM is a 56 page summation that indeed described the company, the business plan, the offering, the risk factors, the customer base and marketplace, the competition, and the nature of the intellectual property. Exhibit B. It also provided a map of the plan of operations that included a marketing plan, capital formation and use of proceeds which included a summary budget laying out the subject of all investment funds ranging from product development, sales and marketing, research and development, legal fees, payroll, and more. It discussed an operational plan and laid out the names and backgrounds of all of the executives and board of directors. Attached to the PPM was the Stock Subscription Agreement. The PPM noted that executives were available to answer questions of the investors following distribution of the PPM.

No one has taken any issue with the representations that were made in the PPM. In the eventual SEC Civil Enforcement action, the SEC attorneys scrutinized the PPM but there were no allegations that any of the information contained misrepresentations or was misleading in any manner. Likewise, not in the indictment, the discovery, nor in the PSR, has anyone made allegations that the PPM

was, in any way, dishonest or even unreasonable. By all accounts, the PPM was handled in a professional and wholly appropriate manner.

## IV. OFFENSE CONDUCT

Mr. Ford has pleaded guilty and accepted responsibility for the charges in the indictment. In particular, he has admitted to making misrepresentations concerning the existence of pilot programs from insurance companies and interest from local and state governments in Fallcatcher's products. It is important to note that the statements Mr. Ford made in emails to DV and in a live presentation that was recorded by DV for "his own purpose," were subsequently republished DV's own initiative and not at the request of Mr. Ford. DV sent these materials to DV's investor clients. In his deposition, DV stated that he did not believe that he told Mr. Ford that he was going to send these emails. DV Deposition at 373-374, Exhibit C. DV earned $500,000 for his role in raising the investment funds.

During the subscription period, prior to any investment funds received by Fallcatcher, there was at least one event where investors appeared in person to sign stock subscription agreements. At that meeting, Scott Bennett, Fallcatcher's CEO and Edward Lynch, Fallcatcher's CFO, met with potential investors and informed them that everything they had heard before was not completely true and then, at that moment, Fallcatcher was merely a concept. See redacted FBI 302 of Ed Lynch

attached hereto as Exhibit "D". Bennett told potential investors that "there were no sales, no commitments, but the one thing they had was a brilliant idea." *Id.*

In addition to the statement of CEO Bennett, the PPM states that the company has no operating history, that the products and services are still being developed and that it is impossible to predict with any level of certainty the degree of success, if any, the company will have in achieving its objectives. The PPM states that "there can be no assurances that the company will operate profitably." Exhibit B at 3. It advised investors that the software code that the product depended on was not yet complete and was not yet fully functional, but rather remained in development. *Id.* at 5. After that statement, investors still chose to invest.

The PPM repeatedly states that the investments being offered involve a higher degree of risk and that the PPM supersedes all prior oral or written information, if any, provided to investors with respect to the offering of the preferred units or the operation of the company. *See e.g.,* Exhibit B at iii. The PPM states that the company agreed to make available to each prospective investor prior to the sale of the stock, the opportunity to ask questions and seek answers from authorized representatives of the company. *Id.* And of significant importance, the PPM makes no representations concerning the availability or prospect of any pilot programs for its product. Because of the substantial nature of the risk involved in this investment, Fallcatcher only considered accredited investors for stock purchases which require

11

that the individual have no less than $1 million in assets or an annual salary of $200,000. Exhibit "B" at 25. Most investors purchased stock valued at between $50,000 to $100,000.

As further evidence of Mr. Ford's fidelity to the idea that investor money was intended solely for the proper operations of Fallcatcher, Mr. Ford accepted no authority over Fallcatcher bank accounts. It was agreed from the start that Mr. Ford would not handle the money. Exhibit C at 485-86, 494-95. All expenditures had to be proposed and approved by the CEO and CFO and substantial expenditures had to be approved by the board of directors. None of those individuals were sued or ordered to pay restitution. To promote transparency and assure that the interest of the investors were being represented, at least one board member was an investor.

Mr. Ford has accepted responsibility for his actions both in the SEC civil action as well as this matter obviating the need for a costly and time-consuming trial. In the civil action, Mr. Ford's concessions resulted in speedy conclusion of the civil complaint without trial and a return of $2,876,185.74 to investors which amounts to approximately 58% of the total funds invested. That level of fund recovery for the victims is mitigating.

## V. OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT

United States Probation placed the loss amount at the total dollar value of all investments: $4,964,775.79, the total of all funds invested by the investors. The

United States Sentencing Guidelines uses Section 2B1.1 to assess a loss amount and establish the loss amount guideline in cases of fraud. The law concerning loss amount calculation at the time of the offense in this case - 2018 - is limited to "the loss the victim[s] actually suffered[,]" as opposed to any calculation based upon what may be alleged as intended loss. *United States v. Banks*, 55 F.4th 246, 258 (3d Cir. 2022).[2] United States Probation determined that the loss amount results in an eighteen (18) level adjustment under U.S.S.G. §2B1.1(b)(1)(G).

> The defense has made the following objection to Probation's loss calculation:
>
> ¶¶ 16-57, 117-118. Defendant objects to the loss calculation. Loss amounts related to Fallcatcher's legitimate operating expense are credited against the total loss amount pursuant Application Note 3(d)
>
> (D) Credits Against Loss.--Loss shall be reduced by the following:
>
> (i) The money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected. The time of detection of the offense is the earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency.
>
> See also *United States v. Scarfo*, 41 F.4th 136 (3d Cir. 2022)(A defendant may receive a credit for expenses he incurred while providing "legitimate" services, "even amid [his] fraudulent conduct[.]" citing *United States v. Blitz*, 151 F.3d 1002, 1012 (9th Cir. 1998).

---

[2] While the defense acknowledges that the sentencing guidelines were amended in 2024 to include intended loss, the sentencing guidelines, as interpreted by the Third Circuit Court of Appeals for conduct occurring at the time of the offense in this case, was actual loss only.

In the SEC's Memorandum of Law in Support of Its Uncontested Motion for Approval of the Parties Proposed Final Consent Judgment dated January 30, 2020, it identifies unspent investment funds in the Fallcatcher bank account as $2,088,590.05 of $4,964,775.79. The difference of $2,876,185.74 is a sum that went to pay salaries, professional fees, operating expenses, vendor fees and other legitimate business expenses that are excluded from loss calculation as stated above. Ultimately, the SEC recovered $2,869,295.41 that was returned to the investors. Combining amounts expended on legitimate business costs with amounts returned to investors results in a loss amount of zero.

A loss amount of zero results in no loss adjustment and a final offense level of 8. With a criminal history of II, the resultant guideline range is 4-10 months incarceration.

In this case, funds received by Fallcatcher were used to advance the progress of the enterprise, all with the goal of improving the value of the investors stock if the company succeeded. While investors did not benefit directly, investors would be the ultimate beneficiary of Fallcatcher's success and would receive significant returns on their investment. Not the SEC, the FBI, nor United States Probation alleges that any of the money spent by Fallcatcher was improperly converted through embezzlement, theft, misuse, or otherwise.

Executives and investors believed in the business concept.

- In an interview with the FBI, JN, an investor, stated that he believed the concept was a good idea and was impressed with the team that Mr. Ford had put together.

- In an interview with the FBI, DR who was Fallcatcher's product management director stated that there were a lot of strong possibilities for biometrics and saw a lot of potential in the product. He believed

>    that Mr. Ford had a good knowledge of sobriety clinics and the analysis seemed good.
>
> - In an Interview with the FBI, Ed Lynch, the Falcatcher CFO believed the Fallcatcher technology was "brilliant" and told a friend who was interested in investing how impressed he was with the technology and convinced him to invest.
>
> - In an interview with the FBI, MM, who was convinced to invest through DV, was intrigued in numerous ways with FallCatcher. The product seemed to offer an "end to end solution" in combating the opioid crisis. MM ultimately accepted a position on the board. MM was "incredibly disappointed" with how it all ended up but did not want to see Mr. Ford face any other legal action.

Courts have distinguished between cases where funds were procured by fraud and spent for legitimate purposes from cases where the purpose of the fraud was simply to cheat the victim. *See United States v. Sublett,* 124 F.3d 693, 695 (5th Cir.1997)(where a defendant "uses fraud to procure a contract but intends to provide the contracted for services," the defendant "should not be characterized as causing as much loss as one who intends to totally cheat the victim, giving nothing in return.") In that case, the court persuasively distinguished between one who perpetrates fraud to win a contract with *no* intent to perform and one who uses fraud to procure a contract but intends to provide the contracted for services.

If the Court does not sustain the defense objection to the loss amount, it should still consider the fact that the misrepresentation was not made with the intent of cheating the investors out of their money, but rather, to capitalize a

15

company that pursued a legitimate plan of operation. Finally, investors received notice of all funds that Mr. Ford personally received as set forth in the PPM, $150,000 salary and back pay for services performed prior to the private stock offering (accrued salaries to officers). Exhibit B at 9. $233,000 of back pay that Mr. Ford had received was returned to the SEC in the civil action.

## VI.  MR. FORD'S AGE IS MITIGATING

Mr. Ford is 51 years old and has a perfect adjustment record while in prison. For individuals between the ages of 51 and 60, with a criminal history equivalent to that of Mr. Ford, the rate of recidivism is 21.7% which drops to 14% after the age of 60. United States Sentencing Commission, *Recidivism Among Federal Offenders, A Comprehensive Overview* at Figure 11. *https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf*; *see also United States v. Lucania*, 379 F. 2d 288, 297 (E.D.N.Y. 2005) ("Post-Booker courts have noted that recidivism is remarkably lower for older defendants"). The commissioners have recognized the advisability of revising the guidelines to take age into account. Measuring Recidivism at 16 (noting that an "offender's age is a pertinent characteristic" that would "improve the predictive powers of the guidelines if incorporated into the criminal history computation").

In imposing the lowest sentence sufficient to account for the need to protect the public from further crimes of Mr. Ford, this Court should consider the statistically low risk of recidivism presented by Mr. Ford's. *See e.g., United States v. Hamilton*, 323 Fed. Appx. 27, 31 (2nd Cir. 2009)("the district court abused its discretion by not taking into account policy considerations with regard to age recidivism not included in the guidelines"); *United States v. Hault,* 46 F.3d, 1004 (7th Cir. 2007)(affirming below guidelines sentence based on defendant's age, which made it unlikely that he would again be involved in a violent crime); *Siden v. United States,* 361 F.Supp.2d 35, 48 (E.D.N.Y. 2005)(basing variance in part on defendant's age of 50 upon release because recidivism drops substantially with age); and *United States v. Nellum,* 2005 WL 300073 at 3 (N.D. Ind., Feb. 3, 2005) (granting variance to 57 year old defendant because recidivism drops with age).

### VII. CONCLUSION

For the foregoing reasons, the defense submits that this Court should impose a mitigated sentence. In recommending this sentence, the defense is not unmindful of the serious nature of these charges and does not intend by these arguments to diminish the severity of Mr. Ford's criminal conduct. Such a sentence would serve the interests of the public while still taking into account all of the circumstances outlined above.

In urging this sentence, Mr. Ford is placing himself at the mercy of the court and respectfully requests that it consider the foregoing analysis and discussion in mitigation of sentence.

Respectfully submitted,

LAW OFFICES OF WILLIAM J. BRENNAN

*William Brennan*
BY: William J. Brennan, Esquire
Attorney ID. 49665
1600 Locust Street
Philadelphia, PA 19103
215-568-1400
Fax: 215-568-1449

LAW OFFICE OF ALAN J. TAUBER

*Alan Tauber*
BY: Alan J. Tauber, Esquire
Attorney ID. 57353
718 Arch Street, Suite 701N
Philadelphia, PA 19106
(215) 575-0702
(215) 703-1675 (Fax)

## CERTIFICATE OF SERVICE

I, Alan Tauber, Esq., hereby certify that I have electronically filed and served a copy of Defendants' Sentencing Memorandum upon the attorneys of record through the U.S. District Court for the Eastern District of Pennsylvania's Electronic Case Filing (CM/ECF) system.

                                              /s/ *Alan Tauber*
                                              ALAN TAUBER

Date:  October 23, 2025