IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,

v.

HENRY FORD,

Defendant.

CRIMINAL ACTION
NO. 23-130

## OPINION

**Slomsky, J.**                                    **January 5, 2026**

### TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 1

II.   BACKGROUND ................................................................................................. 1

   A.  The Corporations .......................................................................................... 2

   B.  The Scheme ................................................................................................... 3

   C.  Investigation by the U.S. Securities and Exchange Commission (the "SEC") ................ 5

   D.  The Present Criminal Case ........................................................................... 7

      i.  Fraud Loss Calculation in the Presentence Report ......................................... 7

III.  ANALYSIS ........................................................................................................ 10

   A.  "Loss" as Described in the United States Sentencing Guidelines and

       *United States v. Banks* .............................................................................. 11

      i.  2018 United States Sentencing Guidelines Manual ....................................... 11

      ii.  Third Circuit Court of Appeals Decision *United States v. Banks* ................ 12

      iii.  2024 United States Sentencing Guidelines Manual ...................................... 14

i

B. The 2018 Guidelines Manual Will Be Used at Sentencing, and "Actual Loss" to the Victims Does Not Include the Money Returned by the SEC ........................................... 16

C. Defendant is Not Entitled to Credit for Any Alleged "Legitimate Business Expenses" Incurred by Fallcatcher Inc…………………………………………………………... ..... 21

**IV.    CONCLUSION** ......................................................................................................... 23

## I.    INTRODUCTION

On March 23, 2023, a grand jury indicted Defendant Henry Ford, a/k/a "Cleothus Lefty Jackson," charging him with one count of securities fraud and aiding and abetting, in violation of 15 U.S.C. § 78j(b), 78ff, 17 C.F.R. § 240.10b-5 and 18 U.S.C. § 2 [Count One], and with seven counts of wire fraud, in violation of 18 U.S.C. § 1343 [Counts Two to Eight].  Defendant has entered guilty pleas to committing these offenses.  The charges stem from a scheme in which Defendant defrauded sixty-one (61) victims out of $4,964,775.79 through a series of deceptive representations and tactics involving the alleged sale of securities.  After an investigation conducted by United Stated Securities & Exchange Commission (the "SEC"), the SEC recovered $2,869,295.41, which was returned to the victims, leaving a balance of $2,095,480.38 still owed to the victims as restitution.  Sentencing is the next step in this case.

The key inquiries now are, first, whether the money recovered by the SEC and returned to the victims should be deducted from the calculation of loss under § 2B1.1 of the United States Sentencing Commission Guidelines in light of the Third Circuit Court of Appeals decision in United States v. Banks, 55 F.4th 246 (3d Cir. 2022).  In Banks, the court held that the word "loss" means the loss or harm the victims actually suffered.  For the reasons discussed below, the answer to this first inquiry is yes.  The second inquiry is whether the balance of the money not returned to the victims should be deducted from the calculation of loss under § 2B1.1 of the Guidelines because this money was allegedly used for "legitimate business purposes" to enhance the mission of the corporation. The answer to the second inquiry is no.

## II.    BACKGROUND

The following facts are agreed to by Defendant and support the charges in the Indictment.

A.    **The Corporations**

Defendant Henry Ford ("Defendant") founded and operated several businesses using the name "Fallcatcher." (PSR ¶12.) Fallcatcher's business was to develop and market an electronic system that was designed to track the use of medication by addiction recovery patients in order to prevent medical billing fraud on insurers and government agencies. (Id.)

In March 2017, Defendant first incorporated an entity named Fallcatcher, Inc. in Florida to facilitate the design of the Fallcatcher system and to hold any patents for Fallcatcher design concepts. (Id. at ¶12.) He used this entity to develop the Fallcatcher system and to raise funds. (Id. at ¶13.) By the Spring of 2018, the Florida entity began to run out of money. (Id. at ¶14.) Needing additional funding for the development of the Fallcatcher system, Defendant incorporated, in May 2018, a Delaware entity with an almost identical name: Fallcatcher Inc. (Id. at ¶14.) Shortly thereafter, in August 2018, a related entity was formed in Delaware named Fallcatcher IP Holdings Co., Inc. (Id. at ¶15.) The purpose of this entity was to hold any patents or intellectual property related to the Fallcatcher system and to license them to Fallcatcher Inc., the other Delaware entity. (Id.)

According to facts agreed to by Defendant, he operated and controlled each of these Fallcatcher entities and held various titles, including President, Vice President, Chief Information Officer, Chief Product Founder, and Chairman of the Board. (Id. at ¶16.) At the initial sentencing hearing held on October 29, 2025, Defendant also described himself as the "Chief Technical Officer" and maintained that his companies were legitimate enterprises and operated by an independent Chief Executive Officer ("CEO") and other businesspeople who believed in the system. (See TR 32 ¶¶21–25; 33 ¶¶1–14.) The money raised by Defendant through fraudulent representations and not returned to the victims was apparently spent by an elected Board and the CEO to promote the business and hire employees. (See TR 36 ¶¶8–25; 37 ¶¶1–

22; 38 ¶¶9–13.)  A detailed Private Placement Memorandum dated August 27, 2018 for Fallcatcher Inc., offering to sell shares in the company, was prepared and released to lure investors to buy stock in the company.

**B.    The Scheme**

As noted, Defendant needed to raise additional capital for the development of the Fallcatcher system after Fallcatcher, Inc, the Florida entity, had begun to run out of money.  (PSR ¶14.)  In May 2018, in order to raise the additional funding, Defendant sought the assistance of an acquaintance, described as Person 1, to aid in fundraising for Fallcatcher.  (PSR ¶18.)  Person 1 had a company in the Eastern District of Pennsylvania that provided information regarding investment products to a network of investors.  (Id. at n.2.)

During their initial communications, Defendant provided Person 1 with descriptions of the Fallcatcher system and false and misleading information about its development and marketing.  (Id.)  For example, on May 27, 2018, Defendant sent to Person 1:

- An email falsely stating that Fallcatcher was "offering 27,500,000 shares of Non-Voting Class Common Stock at a price of [$].275 per share." (Id.)  In the same email, Defendant also falsely stated that the Fallcatcher system had "the support of the Local and Federal Government for development." (Id.)

- An email, referenced in Count Two, falsely stating that Fallcatcher had letters of interest ("LOI") from various insurance companies and healthcare providers to conduct pilot programs with the Fallcatcher system.  (PSR ¶19.)  Defendant attached to that email what purported to be a letter of interest (LOI) from the investment subsidiary of a major insurance company ("Company 1").  (Id.)

3

Similarly, on June 13, 2018, Person 1 requested that Defendant reply to an email request from a potential investor so that Person 1 "could forward" Defendant's response to the prospective investor.  (PSR ¶20.)  Later that day, Defendant responded by email, falsely representing that Fallcatcher had "pilot approvals in writing" with Company 1 and with two other large insurance companies and that several states "want the [Fallcatcher] technology" [Count Five].  (Id.)  In reality, Fallcatcher did not have any pilot programs with insurance companies and the LOI was not a legitimate document.  (Id. n.3.)  Defendant's statements that he had state, local, and federal government support were also untrue. While Fallcatcher engaged a lobbyist (J.K.) in early 2018, whose firm identified state grants that Fallcatcher could apply for, J.K.'s firm stopped working for Fallcatcher by June 2018 after Defendant stopped paying the firm.  (Id. n.4.)

Based on the false information provided by Defendant, Person 1 agreed to provide information regarding Fallcatcher to his investor network.  (PSR ¶21.)  Over the next several months, Person 1 did so through email and in-person presentations.  (Id.)  For example, on June 5, 2018, Person 1 forwarded the May 27, 2018 email described above to his investor network and invited them to attend in-person presentations by Defendant on June 19, 20, and 21, 2018, in Pennsylvania and New Jersey [Count 3].  (Id.)  On June 7, 2018, Person 1 sent a similar email to his investor network [Count 5].  (Id.)

On June 20, 2018, Defendant gave a presentation, which was recorded, where he displayed the Company 1 LOI, claiming that he had nine offers for pilots on the Fallcatcher system between major insurance companies and local government agencies.  Defendant also falsely represented that J.K. had discussions with several state governments to begin pilot programs with Fallcatcher's technology.  (PSR ¶22.)  Over the next several weeks, Person 1

emailed the recording of the presentation to prospective investors.  (See id. at ¶23.)  Between

June 27, 2018 and July 5, 2018, Person 1 sent emails to potential investors with a link to the

videotaped presentation.  (Id. ¶23.)

On August 22, 2018, Defendant emailed potential investors and stated, "We are ready to

start taking investor dollars!"  (PSR ¶24.)  And on August 27, 2018, Fallcatcher finalized the

"Confidential Private Placement Offering Memorandum" (PPM) describing Fallcatcher and its

system, and offering for sale twenty (20) million shares of Fallcatcher at a price of $.50 per

share.  (Id.)  After the time opened in which to buy shares in accordance with the PPM,

Defendant continued to make false representations about Fallcatcher through email and phone

communications with prospective investors.  (Id.)    Specifically, on September 9, 2018,

Defendant emailed potential investors and falsely stated that Fallcatcher would "be moving

forward with [Company 1] and the local State Government in Florida" [Count 8].  (Id.)

Consequently, approximately sixty-one (61) investor victims invested $4,964,775.79 in

Fallcatcher, in return for shares of Fallcatcher's common stock at a price of $.50 per share. (PSR

¶25.)  These investments constituted the purchase of securities.  (Id.)  And although Defendant

did not have access to the investment proceeds located in Fallcatcher bank accounts, bank

records reflect that Defendant and his wife received approximately $493,000 in payments from

Fallcatcher after the proceeds were in the accounts.  (Id.)

**C.    Investigation by the U.S. Securities and Exchange Commission (the "SEC")**

After the SEC[1] initiated an investigation into Fallcatcher, Defendant continued to

promote and conceal his fraudulent scheme.  (PSR ¶27.)  The investigation essentially began on

---

[1]    The SEC is an independent agency of the United States authorized to protect investors by
regulating and monitoring the purchase and sale of securities.  (PSR ¶26.)  Federal securities
law prohibit fraud in connection with the purchase and sale of securities, including making false

November 20, 2018, when the SEC served a subpoena upon Fallcatcher Inc., seeking records, including records regarding Company 1, other insurance companies, and Fallcatcher investors. (Id.)

In February 2019, the SEC subpoenaed Defendant to give a deposition. Defendant appeared and gave false testimony during the deposition, in which he claimed, among other things, that he had received the LOI for Company 1 from a consultant he hired (D.V.V.) and that the consultant had since died. (Id. at ¶28.) In March 2019, Defendant gave the SEC an email that purported to show that the LOI from Company 1 was legitimate and had been sent to his Gmail account on January 24, 2018 from an account used by D.V.V. (Id. at ¶29.) The email, however, was fraudulent in a number of ways, including:

- The Gmail account used to send the email did not exist;

- The Gmail account resembled the legitimate email account of D.V.V.;

- The investigators executed a search warrant on Defendant's Gmail account in June 2019, and the January 24, 2018 email was not found.

- Defendant and D.V.V. had discussed Fallcatcher, but email and phone records show that these discussions began in March 2018;

- The January 24, 2018 email concluded with the salutation "Thanks H." However, D.D.V., who died in May 2018, did not go by "H," and the email does not have the distinctive formatting used by D.D.V.

(Id. at ¶30, n.7.)

---

statements of material fact or omitting a material fact in the information provided to investors. (Id.)

Defendant did not stop his obfuscatory ways there.  In April 2019, Fallcatcher's Board of Directors, including Defendant, signed a Board Resolution requiring Fallcatcher to provide three (3) business days' notice to SEC counsel before disbursing any funds raised from investors to prevent the unauthorized spending of investor funds.  (PSR ¶31.)  But, on April 29, 2019, Defendant caused Fallcatcher to transfer approximately $233,000 to himself, without providing the agreed-upon notice to SEC counsel.  (Id.)  On May 22, 2019, in response to the authorized transfer, the SEC filed a complaint against Defendant and Fallcatcher in the Eastern District of Pennsylvania.[2]  (Id. at ¶32.)  Simultaneously, the SEC was granted a temporary restraining order to prevent Defendant and Fallcatcher from making any further transfers, among other things. (Id.)  On June 18, 2019, a preliminary injunction in favor of the SEC was entered.  On February 26, 2020, the Court entered a final order finding Defendant personally liable for $1,901,643.66 and Fallcatcher liable for $2,295,320.87 in disgorgement.  (Id. at ¶36.)

### D.    The Present Criminal Case

In the instant criminal case, as noted above, a grand jury returned an eight-count Indictment against Defendant.  On May 13, 2025, Defendant pled guilty to all charges in the Indictment, pursuant to a written plea agreement.  (PSR ¶2.)  The parties agreed, pursuant to Federal Rules of Criminal Procedure 11(c)(1)(C), that a sentence of imprisonment between forty-six (46) and seventy-eight (78) months is the appropriate disposition of this case.  (Id. at ¶4.)

### i.    Fraud Loss Calculation in the Presentence Report

The Government and Defendant dispute how to calculate the "loss" attributable to Defendant as that word is used in the Sentencing Guidelines Manual.  Section 2B1.1 of the

---

[2]  The case is titled: Securities & Exchange Commission v. Henry Ford f/k/a Cleothus Lefty Jackson and Fallcatcher, Inc., 2020 WL 1074424 (E.D. Pa. Jan. 30, 2020). The complaint alleged that between August and September 2018, the defendants violated federal securities law.

Sentencing Guidelines is the pertinent provision on "loss" that applies to Defendant's fraud offenses.  This Section initially sets Defendant's base offense level at seven (7).  <u>See</u> U.S.S.G. §2B1.1(a)(1) (noting that base offense level of seven (7) applies if the defendant was convicted of an offense that has a statutory maximum term of imprisonment of 20 or more years). Defendant does not dispute the base offense level of seven (7).  Subsection 2B1.1(b)(1) next lists enhancements to the base offense level that are dependent upon the amount of the loss. Specifically, that subsection reads in part:

(b) Specific Offense Characteristics

(1) If the loss exceeded $6,500, increase the offense level as follows:

| Loss (Apply the Greatest) | Increase in Level |
|---|---|
| (A) $6,500 or less | no increase |
| (B) More than $6,500 | add 2 |
| (C) More than $15,000 | add 6 |
| … | … |
| (I) More than $1,500,000 | add 16 |
| (J) More than $3,500,000 | add 18 |
| (K) More than $9,500,000 | add 20 |

In the Presentence Report ("PSR"), the Probation Officer set the applicable fraud loss at $4,964,775.79.  (PSR ¶48.)  Since the loss exceeded $3,500,000, but was less than $9,500,000," eighteen (18) offense levels were added. (<u>Id.</u>); U.S.S.G. § 2B1.1(b)(1)(J). More precisely, the calculation of Defendant's total offense level as set forth in the Presentence Report reads as follows:

47.    **Base Offense Level:** The guideline for a violation of 18 U.S.C. § 1343 is USSG §2B1.1. Since the offenses of conviction have a statutory maximum term of imprisonment of 20 years, the base offense level is seven. USSG § 2B1.1(a)(1).                    **7**

48.    **Specific Offense Characteristics:** The defendant defrauded the victims out of $4,964,775.79. Since the loss exceeded $3,500,000, but was less

|       |                                                                                                                                                                                                                                                                                                                                 |       |
|-------|---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|-------|
|       | than $9,500,000, [eighteen (18) levels are added]. USSG § 2B1.1(b)(1)(J).                                                                                                                                                                                                                                                        | **+18** |
| 49.   | **Specific Offense Characteristics:** The defendant's fraudulent conduct involved 61 victims. Since the offense involved ten or more victims, two levels are added. USSG § 2B1.1(b)(2)(A)(i).                                                                                                                                     | **+2** |

***

|       |                                                                                                                                                                                                                                                                                                                                                                                                                            |       |
|-------|----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|-------|
| 52.   | **Adjustment for Obstruction of Justice:** Since the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to the defendant's offense of conviction or any relevant conduct; or a closely related offense; therefore, two levels are added. USSG § 3C1.1. | **+2** |
| 53.   | **Adjusted Offense Level (Subtotal):**                                                                                                                                                                                                                                                                                                                                                                                      | **29** |

***

|       |                                                                                                                                                                                                                                                                                                                                     |       |
|-------|---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|-------|
| 55.   | **Acceptance of Responsibility:** The defendant has clearly demonstrated acceptance of responsibility for the offense. Accordingly, the offense level is decreased by two levels. USSG § 3E1.1(a).                                                                                                                                    | **-2** |
| 56.   | **Acceptance of Responsibility:** The defendant has assisted the authorities in the investigation or prosecution of the defendant's own misconduct by timely notifying authorities of the intention to enter a plea of guilty. Accordingly, the offense level is decreased by one additional level.                                   | **-1** |
| 57.   | **Total Offense Level:**                                                                                                                                                                                                                                                                                                             | **26**[3] |

(PSR ¶¶47–57.)  Based on an Offense Level of 26 and Defendant being in Criminal

History Category II, the Probation Officer set the applicable guideline range at seventy-

two (72) to eighty-seven (87) months.

---

[3]  Defendant does not object to the two enhancements described in paragraphs 49 and 52 of the Presentence Report.

On October 29, 2025, the Court began the sentencing hearing.  At the hearing and in his Sentencing Memorandum (Doc. No. 84 ), Defendant Ford objected to the loss amount used in Paragraph 48 and argued that no loss should be attributable to him under § 2B1.1 because: (1) the SEC returned approximately $2,869,295.41 to the investor victims, which amount should be deducted from the total amount of $4,964,775.79 raised by the fraud scheme; and (2) the remainder of the investment funds totaling $2,095,480.38 were used for "legitimate business expenses," and, for this reason, also should not be included in the total "loss" amount.  The Government disagreed with both objections to the calculation of loss by Defendant.  After oral argument by counsel at the October 29, 2025 sentencing hearing on the correct calculation of loss in this case, the Court allowed the parties to submit supplemental briefing on this issue, which the parties timely filed.  (See Doc. Nos. 83, 84.)

For the following reasons, the Court finds that under § 2B1.1 of the Sentencing Guidelines: (1) the money returned to the victims by the SEC is not included in the amount of "actual loss"; and (2) the remainder of investment funds apparently used for "legitimate business expenses" are not excluded from "actual loss."[4]

## III.    ANALYSIS

As noted above, Defendant Ford has two objections to the Probation Officer's calculation of loss in the Presentence Report.  In calculating "loss," the Probation Officer used the 2024 Sentencing Guidelines Manual because the Presentence Report is dated October 25, 2025 and that Manual was in effect on the date of sentencing, which started on October 29, 2025.  But before addressing Defendant's two objections to the loss calculation by the Probation Officer, a

---

[4]    As noted, infra, the Court will use the 2018 edition of the United States Sentencing Guidelines Manual in this case.

discussion of the changes to the calculation of "loss" in the Sentencing Guidelines is necessary to place the two objections in proper context.

### A. "Loss" as Described in the United States Sentencing Guidelines and United States v. Banks

#### i. 2018 United States Sentencing Guidelines Manual

The relevant story on "loss" under § 2B1.1 of the Sentencing Guidelines begins with the 2018 Guidelines Manual because that is the Manual that was in effect at the time of Defendant's offense conduct, which occurred in 2018 and 2019. In this Manual, the Guideline and a pertinent Commentary to the Guideline reads as follows:

**§2B1.1.    Larceny, Embezzlement, and Other Forms of Theft; Offenses Involving Stolen Property; Property Damage or Destruction; Fraud and Deceit; Forgery; Offenses Involving Altered or Counterfeit Instruments Other than Counterfeit Bearer Obligations of the United States.**

(a) Base Offense Level:

(1)    **7**, if (A) the defendant was convicted of an offense referenced to this guideline; and (B) that offense of conviction has a statutory maximum term of imprisonment of 20 years or more.

(2)    **6**, otherwise.

(b) Specific Offense Characteristics

(1) If the loss exceeded $6,500, increase the offense level as follows:

***

U.S.S.G. §2B1.1(a)–(b). [The Offense Level for the ranges of the financial loss is set forth above.]

Most importantly, in the 2018 Manual, loss was not defined in the § 2B1.1 Guideline text itself. Instead, it was defined in the Guidelines' Commentary, in Application Note 3. "Loss" was defined as follows:

3.    **Loss Under Subsection (b)(1).**—This application note applies to the determination of loss under subsection (b)(1).

    (A)    **General Rule.**—Subject to the exclusions in subdivision (D), loss is the greater of actual loss or intended loss.

        (i)    **Actual Loss.**—"Actual loss" means the reasonably foreseeable pecuniary harm that resulted from the offense.

        (ii)    **"Intended Loss.**—"Intended loss" (I) means the pecuniary harm that the defendant purposely sought to inflict; (II) included intended pecuniary harm that would have been impossible or unlikely to occur (e.g., as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value).

***

U.S.S.G. § 2B1.1, Note (3)(A)(i)–(ii). Additionally, the Commentary included another section that permitted credits against loss. <u>See</u> U.S.S.G. § 2B1.1, Note (3)(E). Specifically, Note (3)(E)(i) provided:

    (E) **Credits Against Loss.**—Loss shall be reduced by the following:

        (i)    The money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected. The time of detection of the offense is the earlier of (I) the time the offense was discovered by a victim or government; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency.

U.S.S.G. § 2B1.1, Note (3)(E)(i).

### ii.    Third Circuit Court of Appeals Decision <u>United States v. Banks</u>

The next event on "loss" relevant here occurred on November 30, 2022, when the Third Circuit Court of Appeals decided <u>United States v. Banks</u>. 55 F.4th 246 (3d Cir. 2022). In that seminal decision, the court addressed the proper application of the Sentencing Guidelines' loss enhancement in a wire fraud case, holding that the Sentencing Guidelines' enhancement based on

12

"intended loss," as described in the Guidelines' Commentary, improperly expanded the statutory

term "loss," as used in the guideline itself, which covered only "actual loss." Consequently,

"intended loss" was no longer included in the term "loss" in §2B1.1. Banks, 55 F.4th at 250.

In Banks, the defendant had been convicted by a jury on multiple counts of wire fraud for a

scheme in which he made fraudulent electronic deposits into accounts at Gain Capital Group, a

financial institution, from accounts with insufficient funds. Id. at 251. Although the defendant

attempted to withdraw approximately $264,000 from those accounts, Gain Capital intercepted

every transaction before funds left its control, resulting in no actual loss to the bank. Id.

At sentencing, the District Court held that Section 2B1.1(b)(1)(G) of the Sentencing

Guidelines, which provides for enhanced offense levels based on the amount of "loss," included

not just "actual loss", but also "intended loss." Id. at 253. This decision resulted in a twelve (12)

level increase in Defendant's offense level, which significantly increased his advisory sentencing

guideline range. Id.

On appeal, the Third Circuit rejected the use of "intended loss" for purposes of the § 2B1.1

loss enhancement when the actual loss is zero, holding that the guidelines' commentary

impermissibly broadened the plain meaning of "loss" in the guideline itself and could not be

used to justify the enhancement where the victim suffered no actual financial harm.

In reaching its decision, the Court in Banks relied heavily on the United States Supreme

Court's decision in Kisor v. Wilkie, to determine whether it was required to defer to the

Sentencing Guidelines' Commentary defining "loss" as including "intended loss." 588 U.S. 558

(2019). Specifically, the Court emphasized:

> A court must exhaust all the 'traditional tools' of construction, and determine that
> a regulation is 'genuinely ambiguous.' Under Kisor, then, a court must consider
> the 'text, structure, history, and purpose of a regulation, in all the ways it would if
> it had no agency to fall back on.'

13

Id. at 255–56 (citations omitted).

After careful analysis by the Third Circuit, in which it examined the ordinary meaning of the word "loss" by consulting several dictionary definitions, it found that "loss" in §2B1.1 unambiguously refers to actual pecuniary harm. Further, the Court determined that "in the context of a sentence enhancement for basic economic offenses, the ordinary meaning of the word 'loss' is the loss the victim actually suffered." Id. at 258. Therefore, the Court concluded that the Commentary, by including "intended loss," improperly expanded the definition of "loss" and, thus, "accord[ed] the [C]ommentary no weight." Id. at 256–58. This reasoning was central to the court's decision to vacate Defendant Banks's sentence and remand for resentencing without applying the loss enhancement for "intended loss."

### iii.    2024 United States Sentencing Guidelines Manual

In view of Banks and the disagreement with its holding by other courts, the United States Sentencing Commission proposed amendments to the Sentencing Guidelines and, effective November 1, 2024, moved "intended loss" to the definition of loss in the Guideline text itself. The Guideline under § 2B1.1 now reads as follows:

> **§ 2B1.1.    Larceny, Embezzlement, and Other Forms of Theft; Offenses Involving Stolen Property; Property Damage or Destruction; Fraud and Deceit; Forgery; Offenses Involving Altered or Counterfeit Instruments Other than Counterfeit Bearer Obligations of the United States.**
>
> (a) Base Offense Level:
>
> > (1)    **7**, if (A) the defendant was convicted of an offense referenced to this guideline; and (B) that offense of conviction has a statutory maximum term of imprisonment of 20 years or more.
> >
> > (2)    **6**, otherwise.
>
> (b) Specific Offense Characteristics:

(1) If the loss exceeded $6,500, increase the offense level as follows: U.S.S.G. § 2B1.1(a)–(b). [The Offense Level for the ranges of financial loss is set forth above.]

\*\*\*

**\*Notes to Table:**

(A)    **Loss.**—Loss is the greater of actual loss or intended loss.

(B)    **Gain.**— The Court shall use the gain that resulted from the offense as an alternative measure of loss only if there is loss but it reasonably cannot be determined.

(C) For purposes of this guideline—

(i)    "***Actual loss***" means the reasonably foreseeable pecuniary harm that resulted from the offense.

(ii)    "***Intended loss***" (I) means the pecuniary harm that the defendant purposely sought to inflict; (II) included intended pecuniary harm that would have been impossible or unlikely to occur (e.g., as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value).

\*\*\*

U.S.S.G. § 2B1.1(b)(1)(A)–(C)(ii) (2024 Guidelines Manual).  Additionally, the Commentary still contains the section identical to the one in the 2018 Manual that permits credits against loss in certain circumstances. § 2B1.1, Note (3)(D) provides:

(D) **Credits Against Loss.**—Loss shall be reduced by the following:

(i)    The money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected. The time of detection of the offense is the earlier of (I) the time the offense was discovered by a victim or government; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency.

15

U.S.S.G. § 2B1.1, Note (3)(D)(i) (2024 Guidelines Manual).[5]

**B. The 2018 Guidelines Manual Will Be Used at Sentencing, and "Actual Loss" to the Victims Does Not Include the Money Returned by the SEC**

First, in view of the holding in <u>Banks</u>, Defendant argues that the $2,869,295.41 returned to the investor victims by the SEC should not be included in the total loss calculation under §2B1.1 because to do so improperly expands the amount of actual loss under this Section.  Defendant also argus that the 2018 Guidelines Manual must be used at his sentencing or else the *Ex Post Facto* clause, would be violated. [6]  The Court agrees with Defendant on both arguments.

As an initial matter, unlike the use of the 2024 Guidelines Manual used by the Probation Officer, the Court must use at sentencing the 2018 Guidelines Manual because use of the 2024 Guidelines Manual would violate the *Ex Post Facto* Clause.[7]  An *Ex Post Facto* violation arises when a defendant is sentenced under a Guidelines Manual that would result in a higher sentencing range than the Guidelines Manual in place at the time of the offense.  <u>See</u> <u>Peugh v. United States</u>, 569 U.S. 530, 533 (2013).  The use of the 2018 Guidelines Manual is required for the following reasons.

This Court is bound by the Third Circuit's 2022 decision in <u>Banks</u>, which makes clear that "loss" does not include "intended loss" as described in the Commentary, because "intended loss"

---

[5]  In the 2018 Guidelines Manual, the provision for "Credits Against Loss" is set forth in §2E1.1. In the 2024 Guidelines Manual, this provision has been moved to § 2D1.1.

[6]  U.S. Const. Article I, § 9.

[7]  Generally, as noted above, courts are required to use the Guidelines Manual in effect on the date that a defendant is sentenced. U.S.S.G. §1B1.11(a).  However, "[i]f the court determines that use of the Guidelines Manual in effect on the date that the defendant is sentenced would violate the *Ex Post Facto* clause of the United States Constitution, the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed." U.S.S.G. § 1B1.11(b)(1).

expands the definition of "loss" as used in § 2B1.1.  See Banks, 55 F.4th at 258.  The Banks holding has broad implications and would apply to any change in the definition of "loss" that would expand its definition beyond actual loss to the victims.  In this regard, "loss" means "actual loss" – the financial harm suffered by the victims.  Similar to the financial institution in Banks, which intercepted every transaction before funds left its control, here, the SEC was able to retrieve and return a large portion of the funds paid by the investor victims.  As a result, the victims did not actually lose the returned funds.

    The Government argues that because Defendant's  misrepresentations successfully resulted in investors transferring approximately $4.9 million to Fallcatcher Inc., Defendant caused "actual loss" in that amount once the funds were out of the victims' possession.  (Doc. No. 83 at 5–6.) However, the Court cannot ignore the fact that a portion of the investor's money—even though, and as emphasized by the Government, was out of their possession for an approximate thirty (30) month period—was in fact returned.  At most, Defendant intended to cause that loss.  But, as explained above, Banks controls and would preclude reliance on "intended loss" for conduct occurring before the November 1, 2024 amendments to § 2B1.1.  If the Court were to include "intended loss," as permitted under § 2B1.1 of the 2024 Guidelines Manual, Defendant Ford would face a higher sentencing range, which would violate the *Ex Post Facto* Clause.

    Next, the Government argues that the Guidelines' Commentary, Note 3(E)(i) (2018 Guidelines Manual) [8], and even the Guidelines' Commentary, Note 3(D)(i) (2024 Guidelines Manual), supports its argument that Defendant Ford should not receive "credit" for money

---

[8]   Unlike "intended loss," which was moved after Banks to the text of § 2B1.1, Commentary Note (3)(E)(i) was not moved to the text of § 2B1.1, and, as of November 1, 2024, is still in the Commentary.

returned to the investor victims by the SEC because that provision only allows a defendant to receive credit for money refunded if he, or other persons acting jointly with him, did so before the scheme was detected or about to be detected by a victim or government agency.  (See Doc. No. 83 at 11–13.)  Because the $2,869,295.41 was not returned to the investor victims by Defendant Ford or those acting jointly with him, but was returned by the SEC through money it recovered, the Government asserts that no credit should be applied. See Banks, 55 F.4th at 258.

However, this Commentary does not help the Government for a very simple reason: application of Notes 3(E)(i) and 3(D)(i) improperly expand the definition of "loss."  The holding in Banks, as noted above, prevents a court, when "loss" is an issue, from using the Commentary if it would expand the definition of loss beyond its plain definition, which is the loss the victim actually suffered.  See Banks, 55 F.4th at 258.  In that situation, the Commentary has no weight. See id.; see also United States v. Fecondo, No. 22-cr-00011, 2023 U.S. Dist. LEXIS 203320 (E.D. Pa. Nov. 14, 2023) ("…the Sentencing Commission's interpretation of the Guidelines, as set forth in the Commentary, is entitled to deference so long as it does not improperly expand the Guideline and remains within the outer bounds of permissible interpretation.") (citing United States v. Mercado, 81 F.4th 352, 359 (3d Cir. 2023)).

In this regard, an ambiguity is created by the Government's argument.  Since "loss" as used up until November 1, 2024 only included "actual loss," by arguing that the money returned by the SEC to the victims should be included in "actual loss," the Government is changing the definition of "loss."  No loss occurred because the money was returned.  The same is true by noting that the victims did not have access to the money returned by the SEC for thirty (30) months.  Putting a temporal component on the definition of loss also changes the meaning of the

"loss" as defined in <u>Banks</u> and creates an ambiguity. After <u>Banks</u> and until November 1, 2024, "loss" is "actual loss" – nothing more and nothing less. And that is what should occur here.[9]

Furthermore, it should be noted that the Commentary in Notes (3)(E)(i) and 3(D)(i), when applied, also amends the definition of "actual loss" by putting a condition or temporal component on it by eliminating from actual loss the money returned "by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected." U.S.S.G. § 2B1.1, Note (3)(E)(i). However, while this note or regulation has a noble purpose— to encourage fraudsters or thieves to return the proceeds of their fraud or theft at the earliest possible time before being caught, and not to reward them for returning proceeds after the offense was detected—it expands the definition of "loss." [10] This condition or temporal

---

[9]  Again, <u>Banks</u> dealt with "intended loss," and because "intended loss" was defined in the Commentary rather than in the Guidelines' text, the Third Circuit held that the definition of "intended loss" is afforded no weight. As explained, <u>supra</u>, the holding in <u>Banks</u> would also apply to other Commentary that would expand the definition of "loss."

[10]  More specifically, § 2B1.1, Note 3(E)(i) was adopted on November 1, 2001, in Amendment 617 of the Sentencing Guidelines. Regarding "time of detection," the Commission gave the following reasoning for adopting this provision:

> The loss definition also provides for the exclusion from loss of certain economic benefits transferred to victims, to be measured at the time of detection. This provision codifies the "net loss" approach that has developed in the case law, with some modifications made for policy reasons. This crediting approach is adopted because the seriousness of the offense and the culpability of a defendant is better determined by using a net approach. This approach recognizes that the offender who transfers something of value to the victim(s) generally is committing a less serious offense than an offender who does not.

> The amendment adopts "time of detection" as the most appropriate and least burdensome time for measuring the value of the transferred benefits. The Commission determined that valuing such benefits at the time of transfer would be especially problematic in cases in which the offender misrepresented the value of an item that is difficult to value. Although the time of detection standard will allow some fluctuation in value which may inure to the defendant's benefit or detriment, the Commission determined that, because the time of detection is closer in time to

component results in the actual loss being increased beyond the actual harm to the victims because, as in this case, the SEC returned a portion of the money fraudulently obtained. Since the text of § 2B1.1 (pre-2024 Guidelines) includes only actual loss, the Commentary cannot transform money that victims did not actually lose into a "loss" simply because it was retuned by a third-party and not a defendant or his confederates after detection of the offense. Therefore, Notes 3(E)(i) or 3(D)(i) of the Commentary do not apply and cannot be used to foreclose Defendant from receiving a credit for the money returned to the victims by the SEC.[11]

---

the sentencing and occurs at a point when the authorities are aware of the criminality, its use generally would make it easier to determine a more accurate value of the benefit.

The definition of "time of detection" was adopted because there may be situations in which it is difficult to prove that the defendant knew the offense was detected even if it was already discovered. In addition, the words "about to be detected" are included to cover those situations in which the offense is not yet detected, but the defendant knows it is about to be detected. In such a case, it would be inappropriate to credit the defendant with benefits transferred to the victim after that defendant's awareness.

U.S.S.G., Appendix C, Volume II, Amendment 617.

This historical background does not overcome the ambiguity that arises from the requirement in Banks that "loss" means "actual loss" in §2B1.1. Using the "time of detection" language in the Commentary Note to calculate "actual loss" would result in money recovered by victims not being included in "actual loss."

[11] The Government argues that under the Court's interpretation of Banks and the Commentary Note on "Credits Against Loss," a wealthy person, as opposed to a person of lesser means, has the ability to refund proceeds fraudulently obtained after the fraud is detected and in doing so can lessen their loss calculation under § 2B1.1. This is correct and a consequence of the holding in Banks, as discussed above, which this Court is required to follow. The remedy, however, is not to redefine "loss" by imposing on it a temporal component or other condition, such as the date of detection of the offense by a defendant or his confederates. The remedy is for the Sentencing Commission to propose another amendment to § 2B1.1, moving Note 3(D)(i) of the Commentary to the text of the Guideline itself. This may be true of other Notes in the Commentary to § 2B1.1.

All this being said, if the money returned by the SEC is not included in actual loss, an argument can be made that it can be construed as "intended loss," for which Defendant Ford would be responsible under the Guidelines Manual effective November 1, 2024.  But to use this Manual would increase his potential sentence, a violation of the *Ex Post Facto* Clause.  As such, the 2018 Guidelines Manual will be used at the final sentencing of Defendant Ford to overcome any *Ex Post Facto* concerns.  And finally, as explained above, because the victim investors had the money fraudulently taken from them returned by the SEC, the actual loss under § 2B1.1 would not include the amount of those funds.

### C. Defendant is Not Entitled to Credit for Any Alleged "Legitimate Business Expenses" Incurred by Fallcatcher Inc.

Defendant's second objection to the loss calculation is that because the balance of the money obtained from the investor victims that was not returned was used for "legitimate business expenses," Defendant should be given credit against "loss" for this amount. This argument is unavailing.

Defendant paints a narrative that he is entitled to a credit for the returned money because Fallcatcher Inc. was a legitimate company, and the money was used for legitimate expenses. (See PSR at 45; see also Doc. No. 84 at 4–6.)  But while a defendant in certain situations may receive a credit for expenses he incurred while providing "legitimate" services amid his fraudulent conduct, he may not receive a credit for money spent perpetuating a fraud.  See United States v. Scarfo, 41 F.4th 136, 213 (3d Cir. 2022) (citing United States v. Blitz, 151 F.3d 1002, 1012 (9th Cir. 1998)).

As noted earlier, at Defendant's initial sentencing hearing on October 29, 2025, his defense counsel argued that "[t]he money that was spent by the appropriately elected board" of

Fallcatcher "was done to promote the business." (TR 38 ¶¶9–12.)  Defense counsel further

asserted that while Defendant Ford may have made "misrepresentations to get the funding and

the resources needed," the funding was then "faithfully allocated" for the intended benefit of all

shareholders to pay salaries, professional fees, etc. to grow the business.  (TR 40 ¶¶3–4; see PSR,

Appx A.)  Most notably, however, defense counsel acknowledged that because Fallcatcher Inc. is

a startup business without any income, any assertion that the investors would benefit from this

use of the fraudulently obtained funds is purely speculative.  (TR 41 ¶¶9–16.)  The only benefit

that could come into play here would be the appreciation of the price of the Fallcatcher shares

investors purchased if the company succeeded, a highly speculative prospect at best.  But it is

undisputed that Fallcatcher had no money left over to return to the victims after the SEC

recovered what it could.  And although defense counsel argued at the sentencing hearing that the

victims as shareholders would benefit through an appreciation of their shares had the company

succeeded, the fraud continued after the so-called legitimate company was set up.  In short, the

prospect of a startup company without any income, which was being used as a front to lure

unsuspecting investors and to engage in fraud by one of its major founders, succeeding is entirely

speculative. (TR 38 ¶¶13–23.)

Most significantly, here, no evidence in the record firmly suggests that the investors would

receive any benefit from Defendant or Fallcatcher Inc.  The record does reflect, however, that

when Defendant needed additional funding for Fallcatcher, he set up what appeared to be an

elaborate, legitimate business as part of his scheme to convince victims to invest based upon his

fraudulent misrepresentations.  Simply put, as noted earlier, Defendant Ford set up Fallcatcher as

a front in order to lure his victims to invest in Fallcatcher Inc.  In this regard, on August 22, 2018

Defendant emailed potential investors and stated that Fallcatcher was ready to start taking

investor dollars. The Private Placement Memorandum was finalized on August 27, 2018, which described Fallcatcher Inc. and its offering of 20 million shares at $.50 per share. Yet, even after the period to purchase shares opened, Defendant Ford continued to make false representations about Fallcatcher through emails to prospective investors. On September 9, 2018, Defendant emailed potential investors and falsely stated that Fallcatcher Inc. would be moving forward with a certain company and the local state government in Florida.

As the Court said at the initial sentencing hearing on October 29, 2025: "[Defendant] could set up the most sophisticated company, private placement memorandums, [Defendant] can hire the most honorable people under the sun to run a company, but [Defendant] can't on the side…[b]e luring people in by fraud to invest in that company." (TR 35 ¶¶24–25; 36 ¶¶1–5.)

Fallcatcher was founded upon Defendant's scheme, and the money he raised through investors was accomplished through fraudulent means.  Unlike the cases where legitimate expenditures did result in a credit against loss, here, Defendant Ford to set up an elaborate front, hoping his company would be successful, while also paying himself a significant amount of money secured from the scheme.  On April 29, 2019, Defendant even caused Fallcatcher to transfer approximately $233,000 to himself.  Therefore, while the money obtained from investors apparently was used to create the appearance that it was used for a legitimate purpose, in reality the company was just used as part of Defendant's fraudulent scheme to lure victims into parting with their money.

Accordingly, since the $2,095,480.38 balance was actually lost by the victims, no credit under § 2B1.1 will be applied.

IV.    **CONCLUSION**

For the foregoing reasons, the final Sentencing Guidelines applicable to Defendant Henry Ford's at sentencing will be as follows:

23

- **Base Offense Level:** The guideline for a violation of 18 U.S.C. § 1343 is USSG § 2B1.1. Since the offenses of conviction have a statutory maximum term of imprisonment of 20 years, the base offense level is seven. U.S.S.G. § 2B1.1(a)(1).                                                    **7**

- **Specific Offense Characteristics:** The defendant defrauded the victims out of $2,095,480.38. Since the loss exceeded $1,500,000, but was less than $3,500,000, [sixteen (16) levels are added]. U.S.S.G. § 2B1.1(b)(1)(J).                                              **+16**

- **Specific Offense Characteristics:** The defendant's fraudulent conduct involved 61 victims. Since the offense involved ten or more victims, two levels are added.  U.S.S.G. § 2B1.1(b)(2)(A)(i).       **+2**

- **Victim Related Adjustment:** None.                                   **0**

- **Adjustment for Role in the Offense:** None.                     **0**

- **Adjustment for Obstruction of Justice:** Since the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to the defendant's offense of conviction or any relevant conduct; or a closely related offense; therefore, two levels are added. U.S.S.G. § 3C1.1.              **+2**

- **Adjusted Offense Level (Subtotal):**                                 **27**

- **Chapter Four Enhancement:** None.                                **0**

- **Acceptance of Responsibility:** The defendant has clearly demonstrated acceptance of responsibility for the offense. Accordingly, the offense level is decreased by two levels. U.S.S.G. § 3E1.1(a).                                                          **-2**

- **Acceptance of Responsibility:** The defendant has assisted the authorities in the investigation or prosecution of the defendant's own misconduct by timely notifying authorities of the intention to enter a plea of guilty. Accordingly, the offense level is decreased by one additional level.                                      **-1**

- **Total Offense Level:**                                                **24**

At Offense Level of 24, with a Criminal History Category of II, the guideline range for imprisonment is fifty-seven (57) to seventy-one (71) months. [12]

---

[12] This final calculation of the Guidelines is within the sentencing range of forty-six (46) to seventy-eight (78) months agreed to by the parties in the Guilty Plea Agreement made pursuant to Federal Rules of Criminal Procedure 11(c)(1)(C).